**The PEOPLE of the State of Colorado, Petitioner–Appellee,**

**In the Interest of J.C.R., N.M–E., and N.M–E, Children,**

**and**

**Concerning B.R. and T.R., Respondents–Appellants.**

**No. 10CA1555.**

Colorado Court of Appeals, Div. VI.

May 12, 2011.

Kathryn Schroeder, Arapahoe County Attorney, Marilee M. McWilliams, Assistant County Attorney, Aurora, Colorado, for Petitioner–Appellee.

Powers Law Firm LLC, Jean M. Powers, Littleton, Colorado, for Respondent–Appellant B.R.

Edward G. Schaumberg III, Evans, Colorado, for Respondent–Appellant T.R.

Opinion by Judge HAWTHORNE.

In this dependency and neglect proceeding, B.R. (mother) appeals from the judgment terminating the parent-child legal relationships between her and J.C.R. and between her and N. M–E. and N.M–E. (the twins), and T.R. (father) appeals from the judgment terminating the parent-child legal relationship between him and J.C.R. We affirm.

## I. Factual and Procedural Background

In April 2009, the twins, then seven months old, were removed from mother's and father's care after police responded to a domestic violence incident between mother and M.E., the twins' father. Two days later, six-year-old J.C.R. was also removed. The Arapahoe County Department of Human Services (ACDHS) already knew the three parents because of multiple previous domestic violence and suspected drug use referrals.

Father's and mother's treatment plans required them to participate in substance abuse and mental health evaluations and follow the evaluators' recommendations, maintain con-

tact with the ACDHS caseworker, interact appropriately with the children during visitation, maintain stable housing, and maintain employment producing a legal income sufficient to meet the children's needs. Mother's treatment plan also required her to participate in domestic violence treatment.

In January 2010, ACDHS moved to terminate each parent's parental rights, alleging that they had either not complied with their treatment plans or the plans had not been successful. Based on the ACDHS caseworker's testimony and other evidence at the termination hearing, the trial court terminated each parent's parental rights. Mother and father now appeal.

## II. Mother's Appeal

Mother asserts five claims, which we address and reject in turn.

### A. ICWA Notice

■ Mother contends that the judgment terminating her parental rights must be reversed because the Indian Child Welfare Act (ICWA) notice requirements were not met. We are not persuaded.

The ICWA defines an "Indian child" as any unmarried person under the age of eighteen, who is either an Indian tribe member or eligible for membership and a member's biological child. 25 U.S.C. § 1903(4).

■ The ICWA requires a state to provide notice to the child's or the parent's tribe, or the Bureau of Indian Affairs if the tribe cannot be identified or located, whenever the court knows or has reason to know that an Indian child is involved in any involuntary custody proceeding. 25 U.S.C. § 1912(a). The Guidelines for State Courts indicate that a court may have "reason to believe" the child is an Indian child if (1) any party to the case, Indian tribe, Indian organization, or public or private agency informs the court that the child is an Indian; (2) any public or state-licensed agency involved in child protection services or family support has discovered information which suggests that the child is an Indian child; or (3) an officer of the court involved in the proceeding has knowledge that the child may be an Indian

child. Guidelines for State Courts: Indian Child Custody Proceedings, 44 Fed. Reg. 67584, 67586 (Nov. 29, 1979). The Guidelines are not binding, but they have been considered persuasive by state courts. *B.H. v. People in Interest of X.H.*, 138 P.3d 299, 302 n. 2 (Colo.2006).

Colorado's implementing legislation similarly provides that notice must be given whenever the petitioning or filing party "knows or has reason to believe" that the child who is the subject of the proceeding is an Indian child. § 19–1–126(1)(b), C.R.S.2010.

The Colorado Supreme Court has observed:

> Precisely what constitutes "reason to know" or "reason to believe" in any particular set of circumstances will necessarily evade meaningful description. As in other contexts, reasonable grounds to believe must depend upon the totality of the circumstances and include consideration of not only the nature and specificity of available information but also the credibility of the source of that information and the basis of the source's knowledge. In light of the purpose of the Act, however, to permit tribal involvement in child-custody determinations whenever tribal members are involved, the threshold requirement for notice was clearly not intended to be high.

*B.H.*, 138 P.3d at 303.

In this appeal, mother states that approximately three months after the trial court entered its judgment terminating her parental rights and six days before filing her petition on appeal in this court, she revealed to her counsel, for the first time, that she "believes she is a member of two different Indian tribes." Mother concedes that "this tribal heritage having just been reported," it was not considered during the termination trial. We find no record evidence suggesting that the children might be Indian children was ever presented to or became known to ACDHS, a court officer, or the trial court. To the contrary, ACDHS's motion to terminate states that "[t]he Indian Child Welfare Act does not apply to the facts of this case." Because it had no reason to know or believe that the children were Indian children, the

court entered an oral finding at the termination hearing, with mother present, that the ICWA "does not apply to the facts of this case."

■ A notice obligation arises under the ICWA when the court has reason to know or believe that an Indian child is involved in the case. State courts have read this notice obligation broadly, redressing violations when the child's Indian status is unclear and when Indian descent has been merely asserted. *See B.H.*, 138 P.3d at 303–04. And, because the ICWA protects tribal interests, otherwise sufficiently reliable information cannot be overcome by a parent's actions or be disregarded as untimely. *Id.* at 304.

Here, however, there was no information provided by anyone during the proceedings, much less sufficiently reliable information, or even a mere assertion concerning the children's possible Indian heritage. Thus, the trial court had no reason to know or believe that the children had Indian ancestry and, therefore, no reason to notify the children's or parents' tribe, or the Bureau of Indian Affairs concerning the proceeding.

Mother relies generally on *People in Interest of J.O.*, 170 P.3d 840 (Colo.App.2007), to support her argument that the ICWA notice requirements were not met. Because she does not articulate her reasoning, we assume mother cites *J.O.* to argue that she can assert her, and therefore the children's, possible Indian heritage for the first time on appeal. *See id.* at 842 ("the notice requirements of the ICWA serve the interests of the Indian tribes and, therefore, cannot be waived by a parent and may be raised for the first time on appeal"). Mother also relies implicitly on *In re Justin S.*, 150 Cal.App.4th 1426, 1435, 59 Cal.Rptr.3d 376, 383 (2007), which was cited in *J.O.* and held that ICWA notice issues may be raised on appeal even where the issues were not mentioned in the juvenile court.

Mother's reliance on these cases is misplaced because they are distinguishable. In both cases, the children's Indian heritage had been raised in the termination proceedings and an ICWA notice had been sent to the applicable tribes and the Bureau of Indian Affairs. In *J.O.*, the ICWA notice was sent because the father claimed in a temporary custody hearing to be one-quarter Apache. The mother, who did not attend the termination hearing, challenged the ICWA notice's timeliness and sufficiency for the first time on appeal. In *Justin*, the mother challenged the juvenile court's order reinstating its termination judgment after a limited remand hearing concerning the ICWA notice's sufficiency because she had not received notice of the hearing. Without notice, the mother had been unable to challenge the ICWA notice's adequacy before the juvenile court and therefore, did so for the first time on appeal.

Thus, *J.O.* and *Justin* involved the ICWA notices' sufficiency and not, as here, an ICWA notice not being given because the trial court had no reason to know or believe that the children were Indian children. Further, neither case holds that because a parent asserts the children's possible Indian heritage for the first time on appeal, a remand is necessary to require the trial court to provide the ICWA notice. To the extent *J.O.* and *Justin* can be read otherwise, we disagree and decline to follow them.

Accordingly, reversing the judgment terminating mother's parental rights and remanding for further proceedings under the ICWA is not required.

## B. Compliance with Treatment Plan

Mother contends that the evidence does not support the trial court's conclusion that the criteria for terminating her parental rights had been established. Specifically, she argues that there was no credible domestic violence evidence, and the evidence shows that if she had been given an additional six months to work on her treatment plan, she would have been found to be fit. We agree with the trial court that the grounds for terminating mother's parental rights were proven by clear and convincing evidence.

Under section 19–3–604(1)(c), C.R.S.2010, the legal relationship between a parent and his child may be terminated if the child has been adjudicated dependent or neglected and the court finds based on clear and convincing evidence that the parent did not reasonably comply with a treatment plan approved by

the court or the treatment plan has been unsuccessful; that the parent is unfit; and that the parent's conduct or condition is unlikely to change within a reasonable time.

■ The parent is responsible for assuring compliance with and success of the services provided. *People in Interest of C.T.S.*, 140 P.3d 332, 335 (Colo.App.2006). Although absolute and complete compliance with the treatment plan's provisions is not required, partial compliance, or even substantial compliance, may not be sufficient to render the parent fit. *People in Interest of D.L.C.*, 70 P.3d 584, 588 (Colo.App.2003).

■ The state must afford a parent a reasonable period to comply with a court-approved treatment plan before moving to terminate parental rights. *People in Interest of D.Y.*, 176 P.3d 874, 877 (Colo.App.2007). A reasonable time is not an indefinite time, and it must be determined by considering the child's physical, mental, and emotional conditions and needs. *People in Interest of A.J.*, 143 P.3d 1143, 1152 (Colo.App.2006).

■ In determining whether a parent's conduct or condition is unlikely to change within a reasonable time, the trial court may consider whether any change has occurred while the dependency and neglect proceeding was pending, the parent's social history, and whether the parent's conduct or condition is chronic or longterm in nature. *K.D. v. People*, 139 P.3d 695, 700 (Colo.2006).

Here, the record shows that domestic violence, which had initially led to removing the children from mother's care, continued to be a problem for mother throughout the case. In May 2009, there were concerns that mother was in a domestic violence relationship because she appeared for visitation with bruises on her face. At about that time, mother admitted there had been domestic violence during a camping trip that she and father had taken. In June 2009, there were more domestic violence charges involving M.E., and in August, mother indicated that she was concerned for her safety because she had learned from M.E.'s drug dealer that M.E. was out of jail and had "put a hit out on her." In October 2009, mother once again had visible marks on her face and neck re-sulting from a domestic violence incident involving father.

The caseworker testified that mother did not comply with the requirement that she obtain domestic violence treatment. She did not obtain domestic violence perpetrator's treatment and only partially complied with the requirement that she obtain domestic violence victim's treatment. In addition, she did not comply with her treatment plan's other requirements. While the case was pending, she had never been employed; her contact with the caseworker had usually been limited to excuses as to why she was not working on her treatment plan; she was consistently late arriving for visits with the children; she always had "one excuse or another" for failing to comply with substance abuse treatment; she had not had stable housing; and she had never obtained any mental health treatment.

■ The trial court found that although mother was "somewhat successful" with visitation, she was noncompliant or only partially compliant with her other treatment plan elements, and that, as a result, she was not fit to parent the children. The court rejected mother's request for additional time to work on her treatment plan, noting that "there has already been a great deal of time expended," and finding that "this [situation] is not likely to change within a reasonable period of time." The trial court's findings are amply supported by the record.

## C. Less Drastic Alternatives

■ Mother contends the evidence does not support the trial court's conclusion that there were no less drastic alternatives to terminating her parental rights. She argues that the children could have been placed with their fathers or other family members while she continued to work on her treatment. We are not persuaded.

■ Implicit in the statutory scheme is a requirement that the trial court consider and eliminate less drastic alternatives before entering an order terminating the parent-child legal relationship. *People in Interest of M.M.*, 726 P.2d 1108, 1122 (Colo.1986).

In considering whether there is a less drastic alternative to terminating parental rights, the court must give primary consideration to the child's physical, mental, and emotional conditions and needs. *People in Interest of M.B.*, 70 P.3d 618, 626 (Colo.App. 2003). In determining whether permanent placement with a relative or other person is a viable less drastic alternative to termination, the court may consider various factors, including whether an ongoing relationship would be beneficial or detrimental to the child. *People in Interest of J.L.M.*, 143 P.3d 1125, 1127 (Colo.App.2006). Permanent placement is not a viable less drastic alternative to termination if the children need a stable, permanent home that can only be assured by adoption. *People in Interest of Z.P.*, 167 P.3d 211, 214 (Colo.App.2007).

Here, the caseworker testified that a family placement had been found for J.C.R., but, because any arrangement that would allow his parents to be part of his life would be detrimental to him, terminating both parents' parental rights was necessary. The twins had developmental delays, and the caseworker opined that terminating parental rights was in their best interests so that they could have the stability and permanence that adoption would give them.

Therefore, the record supports the trial court's finding that there was no less drastic alternative to terminating mother's parental rights with respect to all three children.

### D. Reasonable Efforts

Mother contends that ACDHS failed to provide "diligent supportive services" to her. She implies that ACDHS rendered her homeless by requiring that she and father have no contact with one another, and argues that by failing to provide her with assistance in locating housing or income sources, ACDHS failed to make reasonable efforts to reunite the family. We reject this contention.

Generally, the state must make reasonable efforts to prevent out-of-home placement of abused or neglected children and to reunite the family. *C.T.S.*, 140 P.3d at 335. Among other things, the state is required to provide each parent with "[i]nformation and referral services to available public and private assistance resources." § 19–3–208(2)(b)(III), C.R.S.2010. It is then the parent's responsibility to use those services to obtain the assistance that he or she needs to comply with his or her treatment plan's requirements regarding housing, employment, or other matters. *See C.T.S.*, 140 P.3d at 335 (the parent is responsible for assuring compliance with the treatment plan).

Here, the caseworker testified that mother was provided with information on homeless shelters, which could serve as "stepping-stones to housing," and with other resources to assist her in finding housing. She indicated that once mother was given these resources, ACDHS expected her to find her own housing. The caseworker stated that she was also willing to help mother access public benefit programs that could have provided her with legal income. However, although mother told her that she was having trouble getting benefits in place, mother never told her with whom she was working to obtain benefits. Therefore, the caseworker could not follow up to find out what, if anything, ACDHS could do to help.

The trial court reasonably could conclude, based on the evidence, that ACDHS discharged its responsibility to make reasonable efforts to rehabilitate mother and reunite her with her children by providing her with information that she could have used to find housing, and by standing ready to assist her in obtaining any financial benefits for which she was qualified.

To the extent mother argues that ACDHS caused her homelessness by requiring her to live apart from father, we reject her argument. As the trial court noted, throughout the testimony there was evidence of "ongoing domestic violence between the respondent parents that raised child safety issues." Under such circumstances, mother could not provide safe housing for the children by living with father.

### E. Request for Assistant or Advisory Counsel

Finally, under the heading "additional issues," mother "requests an independent review of the record and appointment of experienced appellant [sic] counsel to review the

record and transcripts ... to search for issues not raised by trial counsel, or to construct arguments to support identified issues." We construe this as a request to appoint an assistant or advisory appellate counsel, and we decline to do so.

■■■ Under Colorado law, a parent involved in a dependency and neglect proceeding has the right to be represented at every stage in the proceedings and the right to seek the appointment of counsel if he or she is unable financially to secure counsel on his own or her own. § 19–3–202(1), C.R.S.2010. However, we are aware of no authority, and mother has cited none, for the proposition that a parent is entitled to have "experienced appellant counsel" appointed to assist his or her appointed counsel in representing the parent on appeal. The case cited by mother, *People in Interest of N.A.T.*, 134 P.3d 535 (Colo.App.2006), does not stand for that proposition. Accordingly, mother's request is denied.

### III.  Father's Appeal

■■■ Father contends that the trial court erred in terminating his parental rights by concluding that he had failed to reasonably comply with his treatment plan within a reasonable time. We construe this as contending that there was insufficient evidence that father (1) had failed to comply with his treatment plan, and (2) could not become a fit parent within a reasonable time. We disagree.

Here, more than a year elapsed between April 2009, when J.C.R. was placed in foster care, and July 2010, when the termination hearing took place. The caseworker testified that during that time, father had been "somewhat successful" in obtaining housing, having obtained an apartment approximately two and a half months earlier. She stated that ACDHS required housing in the same location for at least six months before considering returning the child to the home.

Father had missed several visits with the child, partly because he was incarcerated for violating a protection order and partly because a warrant had been issued for his arrest in connection with a domestic violence incident and he did not want the child to see him arrested. Despite the missed visits, the caseworker testified that father had been "partially successful" in his treatment plan's visitation component because when he attended visits, they were "appropriate."

Father had complied with the requirement that he obtain a substance abuse evaluation, and he had not been asked to obtain any treatment. However, father had not complied with his treatment plan's mental health component because, although he had received some therapy, he had not provided ACDHS with any evidence that he obtained a mental health evaluation, which ACDHS would have used to assess his needs. Also, the caseworker was unable to verify that father had completed anger management class.

Father was deemed unsuccessful in maintaining employment because he had not shown he would be able to support the child with his income.

The caseworker reported that continuing alleged domestic violence between father and mother was "[a] large concern" because there had been a past domestic violence pattern which called into question father's ability to protect his child. Referrals involving domestic violence and possible physical abuse and substance abuse had begun in 2001, when mother's and father's oldest child was a little girl, and they had continued after the younger children were born.

The trial court found that father had been at least partially successful with several of his treatment plan's components. However, the court noted that he had not maintained stable housing for a six-month period, there were concerns about domestic violence, and there was no evidence that he earned enough to support himself and his child. The court concluded that "overall," father was not reasonably compliant with his treatment plan and not fit to parent the child, and that the situation was not likely to change within a reasonable time period. The record supports these findings.

The judgment is affirmed.

Judge ROMÁN and Judge RICHMAN concur.