23CA2236 Peo in Interest of APC 09-12-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA2236
City and County of Denver Juvenile Court No. 22JV30516
Honorable Laurie A. Clark, Judge

The People of the State of Colorado,

Appellee,

In the Interest of A.P.C., Jr., A.A-H., and C.C., Children,

and Concerning A.P.C. and J.R.A-H.,

Appellants.

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE GRAHAM*
Brown and Richman*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 12, 2024

Kerry Tipper, City Attorney, Amy J. Packer, Assistant City Attorney, Tierney A. Shea, Assistant City Attorney, Denver, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Padilla Law, P.C., Beth Padilla, Durango, Colorado, for Appellant A.P.C.

Patrick R. Henson, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant J.R.A-H.

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1     J.R.A.H. (mother) and A.P.C. (father) appeal the judgment terminating their parent-child legal relationships with A.P.C., Jr., A.A-H., and C.C. (the children).  We affirm.

I.     Background

¶ 2     In July 2022, the Denver Department of Human Services filed a petition in dependency and neglect after the children tested positive for illegal substances.  In the petition, the Department also alleged that the children were dependent and neglected based on physical abuse, homelessness, and the parents' criminal activity.  The Department assumed temporary legal custody of the children and placed them in foster care.  After the parents admitted to the allegations, the juvenile court adjudicated the children dependent and neglected and adopted treatment plans for the parents.

¶ 3     In June 2023, the Department moved to terminate the parents' parental rights.  The juvenile court held an evidentiary hearing over two days in September and November 2023.  After hearing the evidence, the court terminated the parent-child legal relationships between the parents and their children.

1

## II. Reasonable Efforts

¶ 4    The parents first assert that the juvenile court erred by finding that the Department had made reasonable efforts to rehabilitate them and reunify them with the children.  We disagree.

### A. Applicable Law and Standard of Review

¶ 5    Before a juvenile court may terminate parental rights under section 19-3-604(1)(c), C.R.S. 2024, the county department of human services must make reasonable efforts to rehabilitate parents and reunite families.  §§ 19-3-100.5(1), 19-1-103(114), 19-3-208, 19-3-604(2)(h), C.R.S. 2024.  Reasonable efforts means the "exercise of diligence and care" to reunify parents with their children.  § 19-1-103(114).

¶ 6    Services provided in accordance with section 19-3-208 satisfy the reasonable efforts standard.  § 19-1-103(114).  Among the services required under section 19-3-208 are screenings, assessments, and individual case plans for the provision of services; home-based family and crisis counseling; information and referral services to available public and private assistance resources; family time; and placement services.  § 19-3-208(2)(b).  Other services,

2

including mental health and drug treatment, must also be provided if the county has sufficient funding.  § 19-3-208(2)(d).

¶ 7     The juvenile court should consider whether the services provided were appropriate to support the parent's treatment plan, *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011), by "considering the totality of the circumstances and accounting for all services and resources provided to a parent to ensure the completion of the entire treatment plan," *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33.  The parent is ultimately responsible for using the services to comply with the plan, *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011), and the court may consider a parent's unwillingness to participate in treatment in determining whether the department made reasonable efforts, *see People in Interest of A.V.*, 2012 COA 210, ¶ 12.

¶ 8     Whether a department of human services satisfied its obligation to make reasonable efforts is a mixed question of fact and law.  *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8.  We review the juvenile court's factual findings for clear error but review de novo its

legal determination, based on those findings, as to whether the department satisfied its reasonable efforts obligation. *Id.*

## B. Analysis

¶ 9 The parents' treatment plans required them to (1) address their mental health issues; (2) demonstrate that they could provide the children with a substance-free environment; (3) participate in family time with the children; (4) provide the children with a safe and stable environment; and (5) abstain from further criminal activity and comply with any open criminal cases.

¶ 10 At the termination hearing, the juvenile court found that the parents had not complied with their treatment plans, despite reasonable efforts by the Department. Specifically, the court found that the parents' participation in the case was "very limited," and it noted that they had not even begun to participate in mental health or substance abuse services. The court also found that the Department had attempted to engage the parents by making efforts to "track them down, identify barriers that could be overcome, [and] modify expectations for engagement to encourage engagement."

Ultimately, the court concluded that the Department's effort had been "unsuccessful through no fault of the Department."

¶ 11    The record supports the juvenile court's findings. For example, the record shows that the Department referred the parents for mental health evaluations (as well as a cognitive evaluation for mother), but they never completed the evaluations. The Department also referred both parents for a substance abuse evaluation, but father did not complete his evaluation, and although mother completed hers, she never participated in any sobriety monitoring or treatment. Finally, the record shows that the Department provided the parents with multiple opportunities to participate in family time with the children, including referrals to four different providers, but the parents did not consistently visit the children.

¶ 12    In sum, the record shows that the Department provided the parents with the necessary resources to engage with their treatment plans, but they did not take advantage of those resources. *See A.V.*, ¶ 12; *J.C.R.*, 259 P.3d at 1285. Nevertheless, the parents assert, for the reasons described below, that the juvenile court erred when it

found that the Department had made reasonable efforts. We address and reject each of their contentions.

### 1. Mother

¶ 13 Mother asserts that the Department failed to make reasonable efforts to identify and address her cognitive disability. Specifically, she maintains that the Department knew or should have known about her disability early in the case but failed to do anything to assess it or accommodate her. We disagree.

¶ 14 To begin, the Department and guardian ad litem argue that mother did not properly preserve this issue for appeal. We agree that mother never asserted that the Americans with Disabilities Act of 1990 (ADA) applied in this case. However, she contended in her closing argument at the termination hearing that the Department had failed to "provide accommodations for [mother's] disabilities such as time management and organization skills." At least one division of this court has concluded that a parent can preserve an ADA issue by raising it for the first time in closing argument at the termination hearing. *See People in Interest of C.Z.*, 2015 COA 87,

¶ 9. We therefore conclude that mother sufficiently implicated the issue to allow our review of the merits of her claim.

¶ 15    The ADA does not provide a defense to the termination of parental rights. *People in Interest of T.B.*, 12 P.3d 1221, 1223 (Colo. App. 2000). Nonetheless, a county department of human services has an affirmative duty under the ADA to make reasonable accommodations for a parent with a qualifying disability when providing rehabilitative services. *People in Interest of S.K.*, 2019 COA 36, ¶¶ 25, 34. Therefore, when determining if the department made reasonable efforts in a dependency and neglect case, the juvenile court must consider whether the department made reasonable accommodations for the parent's disability. *Id.* at ¶ 34; *see also* § 19-3-208(2)(g) (requiring that rehabilitative services meet the ADA's provisions).

¶ 16    However, the Department can accommodate only disabilities that are known to it. *S.K.,* ¶ 22. "In other words, before a public entity can be required under the ADA to provide reasonable accommodations, the entity must know that the individual is disabled, either because that disability is obvious or more likely

because that individual, or someone else, has informed the entity of the disability." *Id.*; *see also People in Interest of S.Z.S.*, 2022 COA 133, ¶ 19 (rejecting the parent's assertion that she was entitled to reasonable accommodations because her disability should have been "obvious" to the department).

¶ 17    In this case, mother never directly told the Department or the juvenile court that she had a disability. But, at an April 2023 hearing, the juvenile court questioned whether the Department was offering the appropriate "level of services" because mother might have a "learning disorder." *See* 42 U.S.C. § 12102(1)(A) (a disability includes a mental impairment); 28 C.F.R. § 35.108(b)(1)(ii) (2023) (mental impairment includes a "specific learning disability"). In response, the county attorney noted that it did not have any "documentation or proof" of a "learning disability." Indeed, mother's own counsel stated that she "did not have enough [information] to be able to allow [her] to file any type of notice or motion for ADA accommodations." The court did not order the Department to investigate whether mother had a disability, but the caseworker

nonetheless immediately submitted a referral for a cognitive evaluation.

¶ 18      On appeal, mother suggests that the Department improperly delayed investigating her disability because it must have "suspected" that she had a disability well before the April 2023 hearing. Yet, mother points to nothing in the record to suggest that the Department knew that she had a learning disability, except information showing that she was often late and had trouble engaging in the case. Without more, we are not convinced that this information put the Department on notice that mother had a disability, especially considering that her own attorney told the court that she was not convinced that mother had a disability. We therefore conclude that the Department made reasonable efforts to investigate whether mother had a disability when it referred her for a cognitive evaluation as soon as it became aware of the issue.

¶ 19      But mother never completed the cognitive evaluation, and therefore, the issue of whether she had an ADA-cognizable disability was never resolved. *See S.Z.S.*, ¶ 21 (noting that whether a parent is a qualified individual with a disability under the ADA requires a

fact-specific determination that, if disputed, the court should resolve). Consequently, we are not convinced that, in the absence of any evidence that mother had a disability, the Department was required to provide reasonable accommodations for her.

¶ 20    In any event, mother concedes that the Department attempted to accommodate her by repeating information, following up in writing, and directing her to phone applications to assist her with timeliness. *See S.K.,* ¶ 55 (noting that an accommodation for a "neurocognitive disorder" might include "communicating with [the parent] in a written format" and "giving repeated instructions"). And although mother asserts that these accommodations were ultimately unsuccessful, she never asked for any specific accommodations during the case and does not explain on appeal what accommodations she needed for her purported disability. *See id.* at ¶¶ 49-50 (rejecting parents' arguments that their treatment plans failed to include necessary accommodations because they did not identify what accommodations should have been included in the plans).

¶ 21    We therefore discern no error in the juvenile court's finding that the Department made reasonable efforts with respect to mother.

## 2.    Father

¶ 22    Father asserts that the Department failed to make reasonable efforts because it did not provide him with (1) housing resources or (2) adequate mental health and substance abuse services. For the following reasons, we disagree.

¶ 23    First, father asserts that the caseworker did not assist him with obtaining an apartment or provide him with a life skills worker to assist him in doing so. Section 19-3-208 of the Colorado Children's Code does not describe any specific requirement for the Department to provide financial assistance to a parent for the purpose of securing housing. And father's treatment plan did not include a provision for life skills services. Therefore, because the record shows that the caseworker provided father with a list of housing resources and directed him to the county's housing office, the Department satisfied its obligation under section 19-3-208(2)(b)(III) to provide "[i]nformation and referral services to

11

available public and private assistance resources." *See People in Interest of A.R.*, 2012 COA 195M, ¶ 28 (noting that, as compared to the active efforts standard, a department may be able to satisfy the reasonable efforts standard by passively "requiring a parent to . . . acquire new housing").

¶ 24 Nevertheless, father asserts that section 19-3-208(2)(d)(VIII), which directs the Department to provide "[f]inancial services" to a parent "in order to prevent placement," required the Department to give him financial assistance for housing. We are not convinced because section 19-3-208(2)(d)(VIII) only applies when the provision of "[f]inancial services" would "prevent placement." Nothing in the record suggests that the children would have remained with father if only the Department had provided him financial assistance for housing. In other words, the children were placed out of the home for numerous reasons, including substance abuse and physical abuse, which would not have been ameliorated had father obtained housing. In short, even if section 19-3-208(2)(d)(VIII) requires a department to provide financial assistance for housing, we disagree with father that it does in this case.

¶ 25    Second, father asserts that the Department failed to make reasonable efforts because it did not provide him with mental health and substance abuse services while he was in jail.  As father notes, the caseworker admitted that she did not know whether father could access any services in the jail and did not investigate whether any services were available to him.  Nonetheless, the caseworker reached out to the mental health and substance abuse evaluator "to get him into the jail to complete" the evaluations and the evaluator told the caseworker that "he was going to schedule to go into the jail to complete it."  However, the record shows that the evaluator never made it into the jail to complete the evaluation because father had already been released.  Indeed, although the record is not entirely clear, it appears that father was incarcerated for two relatively short stints of about a month each near the end of the case.  Considering the totality of these circumstances, we cannot say that the Department failed to make reasonable efforts.  *See My.K.M.*, ¶ 33.

¶ 26    Finally, we are not convinced that the Department failed to make reasonable efforts because it did not refer father to inpatient treatment.  There is no doubt that father asked the Department to

13

provide him with this service. But the caseworker explained that the Department had a "policy" that requires a parent to complete an evaluation "in order for the Department to pay for inpatient" treatment. Nevertheless, father asserts that the Department could have referred him to inpatient treatment, even without the evaluation, if Medicaid would pay for the treatment. However, the record does not show that father qualified for Medicaid, and we are therefore not convinced that father would have been eligible for an inpatient program without the Department's assistance.

### III. Less Drastic Alternatives

¶ 27    We also reject father's contention that the juvenile court erred by finding that there was no less drastic alternative to termination.

### A. Applicable Law and Standard of Review

¶ 28    Before terminating parental rights under section 19-3-604(1)(c), the juvenile court must consider and eliminate less drastic alternatives. *People in Interest of M.M.*, 726 P.2d 1108, 1122-23 (Colo. 1986). In considering less drastic alternatives, a court must give primary consideration to the child's physical, mental, and emotional conditions and needs. § 19-3-604(3); *People in Interest of Z.P.*, 167 P.3d 211, 214 (Colo. App. 2007). Long-term

14

placement may not be a viable alternative to termination if the child needs a stable, permanent home that can be assured only by adoption. *Z.P.*, 167 P.3d at 214.

¶ 29 To aid the court in determining whether there is a less drastic alternative to termination, the department must evaluate a reasonable number of persons the parent identifies as placement options. *People in Interest of D.B-J.*, 89 P.3d 530, 532 (Colo. App. 2004). But the department is not obligated to "independently identify and evaluate other possible placement alternatives." *Z.P.*, 167 P.3d at 215.

¶ 30 For a less drastic alternative to be viable, it must do more than "adequate[ly]" meet a child's needs; rather, it must be the "best" option for the child. *A.M.*, ¶ 27. Therefore, if the court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination. *Id.* at ¶ 32. And under those circumstances, we must affirm the court's decision if its findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

## B. Analysis

¶ 31    The juvenile court determined that there was no less drastic alternative to termination and "all known possible alternatives ha[d] been adequately explored."  As relevant here, the court found that paternal grandmother was "not an appropriate placement" and therefore "not a less drastic alternative to termination."  The court also found that the Department had made sufficient efforts to "identify relatives and kin."  But the court noted the Department was not required to "beg relatives and kin to engage in an exploration as to whether they would qualify as a placement."  Ultimately, the court determined that termination and adoption were in the children's best interests and that they needed the permanency that only adoption could provide them.

¶ 32    First, the record supports the juvenile court's finding that paternal grandmother was not an appropriate placement option. *See People in Interest of T.E.M.*, 124 P.3d 905, 910 (Colo. App. 2005) (noting that a court may reject a less drastic alternative because the proposed placement option cannot provide appropriate care).  The caseworker testified that paternal grandmother's background check

16

"was coded as inconclusive" because she had "previous involvement" with the Department for physical abuse of a child and substance abuse. The caseworker also said that the Department ran a background check on paternal grandmother's roommate and the "roommate was coded as disqualified due to criminal and child welfare background." Several months later, the caseworker reinvestigated paternal grandmother and learned that she was moving into a new residence with a significant other. However, paternal grandmother did not return the caseworker's phone calls, and the caseworker did not get information to run a background check on the significant other.

¶ 33 In sum, the record shows that (1) paternal grandmother was initially disqualified as a placement because of her roommate and (2) did not cooperate with the Department's follow-up investigation. Therefore, the record supports the juvenile court's finding that paternal grandmother was not an appropriate placement option and permanent placement with her was not a less drastic alternative to termination.

¶ 34   Nonetheless, father maintains that the Department failed to adequately investigate paternal grandmother for two reasons. First, he asserts that the Department improperly declined to do a home study during the first investigation. But the caseworker explained that she did not submit a home study because paternal grandmother's "roommate was disqualified" by the background check. In other words, the home study would have been futile because the Department could not place the child in a home with the roommate. Second, father argues that the Department unnecessarily delayed reinvestigating paternal grandmother for about two months after the juvenile court ordered the Department to investigate her. We disagree because there is nothing in the record to suggest that the short delay resulted in any error. Rather, the record shows that the caseworker attempted to contact paternal grandmother multiple times before the conclusion of the termination hearing, but paternal grandmother did not return her calls.

¶ 35   Next, father asserts that the Department did not make adequate efforts to contact the individuals named in his relative

18

affidavit.  Here, father submitted a relative affidavit listing fourteen relatives and friends as possible placement options.  However, father did not include complete information for these individuals.  For example, he listed only the first names of some folks and provided only a Facebook account to reach them.  The caseworker reported that she had to create a Facebook account to contact some of the people listed, but she otherwise called the individuals for which she had phone numbers.

¶ 36    The record shows the caseworker attempted to contact each of the individuals that father had listed in the fall of 2022, but, for the most part, they did not respond, or the caseworker did not have the correct contact information.  Then, at a review hearing in January 2023, father's counsel recognized the caseworker's attempts to contact the individuals named by father and said that she would work with father to contact the people who had not responded.  Father agreed that he would "be more able to get ahold of them."  Nothing in the record indicates that father ever provided any additional information about these individuals listed or that any of

19

them ever reached out to the Department after the January 2023 hearing.

¶ 37   Father now asserts that the Department failed to make adequate efforts because the caseworker only attempted to contact these individuals a single time.  Father relies on the Department's regulation that defines "family search" as "the diligent and timely good faith effort to locate and contact . . . other adult relatives." Dep't of Human Servs. Reg. 7.000.2, 12 Code Colo. Regs. 2509-1. But this regulation only requires that the Department attempt to locate and contact relatives.  And the record shows that the Department conducted diligent searches for relatives and attempted to contact them.  Father does not direct us to anything in the regulation that would require the Department to attempt to make follow-up contacts with individuals who do not respond to the Department for it to satisfy the regulation.

¶ 38   In any event, we are not guided by the Department's regulation.  Rather, for purposes of a less drastic alternative consideration, the Department only has a duty to evaluate a reasonable number of persons the parent identifies as placement

options.  *See D.B-J.*, 89 P.3d at 532.  The record indicates that the Department attempted to investigate the individuals listed on father's affidavit.  *See B.H.*, ¶ 82 (concluding that the department adequately investigated relatives for purposes of less drastic alternatives where the caseworker said that she "thought" that she sent "family finding letters" even though "she didn't have a record of it").  Therefore, we agree with the juvenile court's assessment that the Department did enough to investigate these individuals and that it was not required to track down every single person on father's relative affidavit, especially once father indicated that he would try to contact them and let the Department know if any of them would be interested in being a placement.

¶ 39 Finally, even assuming that one of the relatives was an appropriate placement option, we discern no error because the record indicates that a less drastic alternative was not in the children's best interests as they needed permanency that could only be achieved through adoption.  *See Z.P.*, 167 P.3d at 214.  In other words, the juvenile court determined, with record support, that

21

regardless of potential placement options, there was no less drastic alternative to termination.

## IV. Disposition

¶ 40 The judgment is affirmed.

JUDGE BROWN and JUDGE RICHMAN concur.